# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

RICHARD D. SMITH,

       Plaintiff,

v.                            Case No. 04-CV-72938-DT

ACO, INC.,

       Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S
## "MOTION FOR SUMMARY JUDGMENT"

On July 19, 2004, Plaintiff Richard D. Smith filed a one-count complaint against

his former employer ACO, Inc. in Wayne County Circuit Court, alleging retaliatory

discharge in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601

*et seq.*  Defendant ACO, Inc. removed the case to this court on August 3, 2004.  This

matter is currently before the court on Defendant's January 31, 2005 "Motion for

Summary Judgment."  Defendant's motion has been fully briefed and the parties

presented oral argument on the motion April 19, 2005.  For the reasons set forth below,

the court will grant the motion.

## I.  BACKGROUND

Defendant ACO operates sixty-nine retail hardware stores throughout the greater

Detroit metropolitan area and southeast Michigan.  (Def.'s Mot. Br., Ex. 1 at 2-3.)

Before his March 4, 2004 discharge, Plaintiff served as a manager at ACO's Hardware

store in Livonia, Michigan.  Plaintiff began his at-will employment with Defendant in

1979 as a part-time cashier and worked his way up to become a store manager nine

years later in 1987.  (Pl.'s Dep. at 84-85, 98.)  During his tenure as store manager, Plaintiff was assigned to several locations, his most recent stores were located in Westland ("store number 883") and Livonia ("store number 004").  The parties do not dispute that Plaintiff received favorable performance reviews during his employment prior to calendar year 2003.  (*See* Dunlap Dep. at 21.)

As a store manager, Plaintiff reported to the "Regional Supervisor" in the region where his store was located.  The "Regional Supervisor" was responsible for conducting his annual performance reviews.  John Williamson served as Plaintiff's regional supervisor from 2000 to the fall of 2003.  Andrew Moss became his regional supervisor sometime in the fall of 2003 and continued in this capacity until Plaintiff's release from employment on March 4, 2004.  (Pl.'s Dep. at 112-13; Moses Dep. at 4.)  These two regional supervisors, Williamson and Moss, report to Dick Rosenberger as Director of Operations, who in turn reports to Defendant's Vice President of Operations, Robert Dunlap.  (*See* Def.'s Br., Ex. 1 (ACO Employee Handbook) at Organizational Chart.)  The parties do not dispute that Mr. Dunlap possessed the authority and made the discharge decision in Plaintiff's case.  (Dunlap Dep. at 5.)

ACO's Family and Medical Leave policy is outlined in an employee handbook distributed to all employees.  Under Defendant's policy, employees' 12 weeks of eligible FMLA leave is calculated using a "rolling" twelve month period measured backward from the date of the employee's last requested leave.  This method of calculating the 12 weeks of FMLA leave is permitted under 29 C.F.R. § 825.200(b)(4) & (c).  Defendant also requires that an employee taking FMLA leave must use his accrued paid time off first and take the remainder of eligible FMLA leave as unpaid leave.  (Def.'s Mot. Br. Ex.

2

1 at Appendix A.)  Jayne Polisano is the "Director of Human Resources and Employee Relations at ACO and is responsible for preparing the appropriate FMLA forms in response to an employee's leave request.

Also under ACO's vacation policy, salaried employees, such as Plaintiff, may accrue up to twenty-five vacation days for one calendar year.  (*Id.* at 45.)  Salaried employees accrue vacation days in half day and full day increments.  They are required to "record vacation usage on their Utilization Report" in these same increments.  (*Id.*; Polisano Dep. at 14; Pl.'s Dep. at 126.)  These "utilization reports" are used so that Defendant's payroll department can track time used or taken by salaried employees.  Defendant's policy also provides:

> Weekly "Utilization Reports" will be completed by all salaried personnel.
> All normal and/or regularly scheduled business hours must be included.
> An accurate record of your vacation & personal/sick balance should be
> maintained.  Falsification of utilization reports will result in immediate
> termination.

(Def.'s Mot. Br., Ex. 1 at 38.)

During the course of his employment with ACO, Plaintiff requested and was approved for FMLA leave on three different occasions.  First, in 1996, Plaintiff was approved for an eleven-week FMLA leave period to donate bone marrow for his brother who had been diagnosed with leukemia.  (Pl.'s Dep. at 159-61; Def.'s Mot. Br., Ex. 2.) Second, in 1999, Defendant approved a four to six-week FMLA leave while his wife received a stem cell transplant as part of her treatment for breast cancer.  (Pl.'s Dep. at 163-64; Def.'s Mot. Br., Ex. 4 (7/26/99 Request for FMLA Leave).)  Plaintiff returned to work after both of these FMLA leaves without incident or complaint.

The third FMLA leave is the protected activity giving rise to Plaintiff's allegation of retaliation.  Plaintiff injured his knee on January 13, 2004.  On January 14, 2004, he informed his employer of his injury and indicated to his supervisor, Moses, that he would not be coming into work.  Plaintiff testified that he injured his knee playing racquetball, while Moses maintains that Plaintiff called and informed him that Plaintiff's injury was incurred while moving furniture.  (*See* Moses Dep. at 21-22.)  A formal leave request was prepared on January 15, 2004.[1]  (Def.'s Mot. Br. Ex. 6.)  Upon receipt of Plaintiff's request, Defendant approved two weeks of FMLA leave for Plaintiff beginning on January 13, 2004.  Plaintiff's leave was originally scheduled to end January 27, 2004.  During his leave, the company required Plaintiff to furnish medical certification regarding his "serious health condition" and to provide periodic status reports every 4 weeks.  (*Id.*)  Plaintiff's FMLA leave was later extended until he returned to work on March 4, 2004.  On that day, Plaintiff was terminated during a meeting with Dunlap, Rosenberger, and Moses.  (Pl.'s Dep. at 181.)

Defendant maintains that it had made the decision to discharge Plaintiff for various performance related reasons on Friday January 9 or Saturday January 10, 2004, at a time when it could not have been aware of Plaintiff's FMLA leave request made on Wednesday, January 14, 2004.  Defendant avers that not only was the decision to discharge made before it could possibly know about the protected FMLA leave request, but that its reasons were entirely unrelated to Plaintiff's FMLA leave.

Defendants identify several areas where Plaintiff's performance declined in 2003. Dunlap and Williamson testified that, in December 2002, they became aware that

---

[1] The request was made using the Department of Labor's Form WH-381.

4

Plaintiff was suspected of having an improper relationship with another employee,
Nicole Welch, the "Paint Advisor" at Plaintiff's Westland store.  (Dunlap Dep. 28-30;
Williamson Dep. 8-9.)  ACO policy forbids friends or relatives from working in the same
location "where it may involve them in a reporting and/or supervisory relationship which
could result in, or be perceived to be, a conflict of interest."  (Def.'s Mot. Br., Ex. 1 at
11.)  Plaintiff denies that he had a romantic relationship with Ms. Welch while he was
her supervisor.  Plaintiff testified that his dating relationship with Welch did not begin
until April 2003 (Pl.'s Dep. at 8-9.)  The record shows that Ms. Welch is Plaintiff's
present wife.  (*See id.*; Dunlap Dep. at 28-30.)

Defendant transferred Plaintiff from the Westland store to the Livonia store based
on this suspected relationship with Welch and its negative impact on employee morale.
(*See* Dunlap Dep. at 28-31; Williamson Dep. 8-9.)  Dunlap and Williamson stated that
they believed that Plaintiff's denial of the existence of the relationship was dishonest.
Williamson also testified that he talked with Plaintiff about this issue but did not formally
reprimand him.  (Dunlap Dep. at 30; Williamson Dep. at 8-9.)

Plaintiff's formal performance review conducted by Williamson in May 2003 also
registers Defendant's concerns with Plaintiff's performance.  Although Plaintiff scored
relatively well in many areas of evaluation, Williamson made two specific comments
regarding his concern for Plaintiff's performance and truthfulness.  Under the heading
"Communications Skills," Williamson noted that Plaintiff "cannot always be relied on to
convey situations truthfully."  (Def.'s Mot. Br., Ex. 7 at 4-5.)  Likewise in the "Values"
heading on the review, he wrote that Plaintiff was "not always forthright or honest."  (*Id.*
at 5.)

5

In the "Dedication & Commitment" heading, Williamson rated Plaintiff a "2" or "Solid Performer," but specifically noted that the rating "could be [a "1"] if based on the end of the year." (*Id.*)  A numeric rating of "1" corresponds to "needs improvement." (*Id.* at 1.)  Also, in typed comments, Williamson noted: "The problem still remains concerning [Plaintiff's] absenteeism from regional and corporate meetings.  It is important for Rick to represent his store at these functions.  They are not voluntary attendance. [sic]  The way Rick left store 883 when transferred to 004 without informing his management staff or crew was uncharacteristically unprofessional." (*Id.; see also* Williamson Dep. at 26-27.) ).  Plaintiff's signature appears at the end of this evaluation next to the date May 7, 2003.  (*Id.* at 5.)

During his deposition, Williamson was questioned about his comments under the "Dedication and Commitment" heading.

> Q.  And then you gave him a good review there?
> A.  Yes.
> Q: Okay.  "Dedication and commitment, could be 1 if based on end of the year?"
> A.  Right.  He was having a tremendous amount of attendance and personnel problems at the end of the year but I tried to give him the benefit of the doubt because it wasn't all year long that he had the problem.

(Williamson Dep. at 16.)

Moses, Plaintiff's supervisor beginning in the fall of 2003, testified that he had heard complaints from employees about Plaintiff's not being around the store.  (*See* Moses Dep. at 6.)  Moses testified that he talked with Plaintiff about turning in his weekly utilization sheets and noted the fact that Plaintiff had eight missing sheets in a nine-month time period during 2003.  (Moses Dep. at 7-9.)  Moses also explained that he "researched [plaintiff's] work days" and that this research was used in making the

decision to discharge Plaintiff.  (Moses Dep. at 4.)  Moses testified that he noticed a

pattern of absences from the store when comparing store schedules with Plaintiff's

utilization sheets.  (*Id.* at 5.)  Moses testified that his comparison showed that Plaintiff

was scheduled for "vacation" days when no utilization report was turned in for those

same days.  (*Id.* at 5, 10-11.)  He concluded that there were at least 16 and one-half

days for which Plaintiff was paid regular time rather than claiming vacation as required

on a utilization report.

> Q.  Do you know if any manager has been terminated other than Rick
> Smith for failure to turn in a utilization sheet?
> A.  Rick Smith wasn't terminated necessarily for not turning in a utilization
> sheet.
>
> Q.  But that's not my question.  Are you aware of any managers other than
> Rick Smith that was [sic] terminated for not turning in a utilization sheet?
> A.  I don't have privy to all that information.  I just don't know.
>
> Q.  Okay.  And for not turning in a utilization sheet, is that how they arrived
> at [Plaintiff] being off 16-and-a-half days in 2003?
> A.  No, it was arrived – did you want to know how it was arrived at?
>
> Q.  Yes.  Yes.
> A.  All right, it was arrived at the fact that there were at least 16-and-a-half
> days that he was paid regular time for rather than claiming vacation so he
> was not at the location and he got regular pay for it because of the fact
> that he did not list on his utilization sheet that he was not there.
>
> Q.  And how do you know he wasn't there?
> A.  I got the schedule, made copies of the schedules kept in the store and
> they mark on there who's there and who's not[,] plus there were several
> times that he was crossed off and written across on vacation.

(Moses Dep. at 10-11.)  Moses stated that he provided to Dunlap the results of his

investigation in late December 2003 or early January 2004.  Dunlap testified that he

concluded that Plaintiff was getting paid for hours he did not work.  (Dunlap at 14.)

Dunlap states that he made the decision to discharge Plaintiff based on information gathered by Mr. Moses and Mr. Rosenberger. (Dunlap Dep. at 5-6.) Dunlap stated that he instructed Mr. Moses to review Plaintiff's past utilization sheets and schedules for 2003 sometime in November or December 2003. (*Id.* at 6.) Williamson also testified that Dunlap asked him for information concerning problems Williamson had with Plaintiff's performance "somewhere around Christmas[ ] time last year [2003]." (Williamson Dep. at 21-22.) Moses stated that he learned of Dunlap's decision to fire Plaintiff on January 9 or 10, 2004 and Ms. Polisano testified that she was informed of the decision (and concurred with it) on January 12, 2004. (Moses Dep. at 12; Polisano Dep. at 12-13.)

Defendant also cites evidence that Plaintiff was opening his store late or closing it too early, (*See* Dunlap Dep. at 15-16), and that he was failing to attend mandatory regional manager meetings. Although Plaintiff testified that he was never informed of the mandatory nature of these meetings, his May 2003 performance review, which he signed, noted the problem "concerning [his] absenteeism from regional and corporate meetings" and indicated that they were not voluntary. (Def.'s Mot. Br., Ex. 7.) Dunlap testified that no other managers missed regional manager meetings as often as did Plaintiff and that other managers noticed his absences. (*See* Dunlap Dep. at 30.)

According to Dunlap, he authored a termination letter for Plaintiff during the first week of January 2004 and dated it January 14, 2004, the day he was scheduled to meet with Plaintiff to inform him of the company's decision to end his employment. (Dunlap Dep. at 6-7, 10.) The letter/memorandum was not presented to Plaintiff until March 4, 2004. It was not prepared on company letterhead and provides:

8

During the year 2003 it has been noted that Rick Smith has not been operating store #004 with the type of dedication required of an Aco Store Manager. The most glaring area is time off taken and the accountability for that time off. At least 8 utilization sheets were never turned in. This is a requirement of all salaried personnel. In conjunction with these missing utilization sheets Rick took varied amounts of time off that were never recorded as vacation or personal time and was paid his regular salary. This amounts to approximately 16 ½ days. In reviewing schedules throughout the year it was also noted Rick worked several 2 and 4 hour days. Aco's managers are on a minimum 5 day work week. Rick seldom worked a full 5 day work week.

In reviewing alarm logs there were several nights that Rick worked that the alarm was set at 3 to 6 minutes after close. To close a store properly and handle Aco's assets as instructed it would be almost impossible to do this. It was noted that on several of Rick's Saturday openings he opened the store 7 to 15 minutes after the desired arrival time for opening a store to get ready for the work day. Rick had also missed several Regional Manager Meetings this past year.

In reviewing all of the above Rick has demonstrated a lack of dedication and honesty that are determined to be paramount in an Aco Store Manager. For these reasons it has been decided to terminate Rick Smith's employment on this date January 14, 2004.

(Def.'s Mot. Br. Ex. 8; Pl.'s Resp., Ex. G.) Plaintiff labels this document as "extremely suspicious" noting that "it is not dated, it is not on letterhead, could have been written by anybody at any time and was not produced until after Plaintiff took FMLA leave." (Pl.'s Resp. at 6.)

Moses testified that a meeting with Plaintiff was scheduled for January 14, 2004 where Dunlap intended to inform him that he was being fired. According to Moses, the meeting did not occur because Plaintiff called one hour prior to the meeting, informing Moses that he had injured his knee and would not be in to work. (Moses Dep. at 21-22.) Defendant avers that it then made the decision to postpone executing Plaintiff's termination until after he returned to work. (See Moses Dep. at 24.)

9

Plaintiff argues that Defendant's asserted reasons are mere pretext for retaliating against him for exercising his FMLA rights.  Plaintiff notes the undisputed fact that he was informed of his discharge on the very day he returned from approved FMLA leave and that one of the reasons given for his termination was "attendance which causally connects his termination" to his latest FMLA leave.  (Pl.'s Resp. at 1.)  He further alleges that the record shows that no other managers were terminated for engaging in the same conduct as Plaintiff.  (*Id.*)

Plaintiff also argues that Defendant's assertion that it made the decision to terminate Plaintiff prior to his taking FMLA leave is "a mere pretext and smells of mendacity."  (*Id.*)  Plaintiff disputes failing to record 16 ½ days of vacation accurately, (Pl.'s Dep. at 182-83), claims that his May 2003 review "has obviously been doctored," and asserts that the termination letter purportedly authored by Dunlap in early January 2003 before he sought FMLA leave is "extremely suspicious."  (*See* Pl.'s Resp. at 1-2.) Plaintiff argues that he has demonstrated a prima facie case of retaliation and a triable issue of fact remains on the ultimate issue of discrimination because there exists evidence that the asserted reasons for his discharge were merely pretext for retaliation.

## II.  STANDARD

Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment motions, provides in part that:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

10

Fed. R. Civ. P. 56(c).  The moving party has the burden of demonstrating that there is no genuine issue as to any material fact, and summary judgment is to be entered if the evidence is such that a reasonable jury could find only for the moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Mt. Lebanon Per. Care Home, Inc. v. Hoover Univ., Inc.*, 276 F.3d 845, 848 (6th Cir. 2002).  It is not necessary for the moving party to support its motion with affidavits or other similar forms of evidence; rather, the movant need only show that "there is an absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

The moving party may meet his initial burden by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his case.  *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).  If the moving party meets this initial burden, the non-moving party must then present admissible evidence establishing a genuine material issue of fact.  *Id.*  The non-moving party cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative [admissible] evidence in order to defeat a properly supported motion for summary judgment."  *Id.*  The party who bears the burden of proof must present evidence establishing a jury question as to each element of his claim.  *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000).

Failure to present sufficient evidence on an essential element of a claim renders all other facts immaterial for purposes of summary judgment.  *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).  Although the non-moving party is entitled to a review of the evidence in the light most favorable to him, he is required to

11

do more than simply show that there is some "metaphysical doubt as to the material facts." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994) (quoting *Matsushita Elec. Ind. Co.*, 475 U.S. at 586)).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 250. Therefore, the court must necessarily examine the evidence provided in a light that is most favorable to the non-moving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), and decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," *Ander*son, 477 U.S. at 251-252.

Cases of alleged discrimination, involving state of mind issues, are not necessarily inappropriate for summary judgment, *Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996)*,* and, in the employment context, conclusory allegations and subjective perceptions or assessments do not constitute evidence "sufficient to stave off summary judgment." *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 463 (6th Cir. 2001); *see also Chappel v. GTE Prods. Corp.*, 803 F.2d 261 (6th Cir. 1998) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of [ ] discrimination.").

## III.  DISCUSSION

The FMLA entitles an eligible employee to as many as twelve weeks of leave during any twelve-month period if the employee has a "serious heath condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).  The statute defines  "serious health condition" as "an illness,

12

injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* at § 2611(11).  An employee seeking to use his FMLA leave must notify the employer that FMLA-qualifying leave is needed.  *Chandler v. Specialty Tires of Am. Inc.*, 283 F.3d. 818, 825 (6th Cir. 2002); *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir. 1998).  The FMLA also gives the Secretary of Labor notice and comment rule-making authority and directs the Secretary to issue regulations "necessary to carry out" the Act.  29 U.S.C. § 2654; *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002).

There are two distinct theories for recovery under the FMLA: (1) the "entitlement" or "interference" theory arising from 29 U.S.C. § 2615(a)(1); and (2) the "retaliation" or "discrimination" theory arising from 29 U.S.C. § 2615(a)(2).  "The [FMLA] creates 'prescriptive and proscriptive employee rights.'"  *Taylor v. Union Inst.*, 30 Fed.Appx. 443, 2002 WL 252443, at *7 (6th Cir. Feb. 19, 2002) (unpublished opinion) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)); *see also Arban*, 345 F.3d. at 400-01.  Plaintiff's claim rests on allegations of retaliation for exercising his FMLA rights.

Under Sixth Circuit precedent, the court examines claims of retaliation based on a plaintiff's exercise of FMLA rights in the same manner as other employment retaliation claims.  More specifically, the Sixth Circuit has noted:

> [I]n *Skrjanc v. Great Lakes Power Service Company*, 272 F.3d 309 (6th Cir. 2001), this court held that the *McDonnell Douglas* burden shifting framework should be applied to FMLA retaliation claims that are based upon indirect evidence. . . . Under *McDonnell Douglas*, a plaintiff relying upon indirect evidence must first establish a *prima facie case*.  The employer then has the burden of articulating a legitimate

13

nondiscriminatory reason for the adverse employment action.  Finally, the plaintiff must show that this nondiscriminatory reason was in fact pretextual and that unlawful discrimination was the real reason for the adverse action.

*Gibson v. City of Louisville*, 336 F.3d 511, 513 (6th Cir. 2003) (citations omitted).  In order "to succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right."  *Spurlock v. Peterbilt Motors Co.*, 2003 WL 463491, *1 (6th Cir. Feb. 19, 2003) (quoting *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1207 (11th Cir. 2001)); *see also King v. Preferred Tech. Group*, 166 F.3d 887, 891 (7th Cir. 1999).  Thus, in the absence of direct evidence, the court employs the familiar *McDonnell Douglas* burden-shifting analysis.

To establish a prima facie case of retaliation under the FMLA, Plaintiff must establish: (1) that he engaged in a statutorily protected activity; (2) that the employer knew of his protected activity; (3) that he suffered an adverse employment action; and (3) that a causal connection existed between his protected activity and the adverse employment action.  *Skrjanc*, 272 F.3d at 314; *see also Wade*, 259 F.3d at 463; *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990).  If a prima facie case is established, the employer must produce a legitimate non-discriminatory reason for its actions, upon which event a plaintiff must come forward with specific evidence of pretext.  However, the plaintiff bears the ultimate burden of proving discriminatory retaliation by a preponderance of evidence at trial.  *See Agee v. Northwest Airlines Inc.*, 151 F. Supp. 2d 890, 896 (E.D. Mich. 2001); *King,* 166 F.3d at 892 ("When a plaintiff alleges a retaliatory discharge under the FMLA, the plaintiff must similarly establish that the employer engaged in intentional discrimination.").

14

Defendant argues that it is entitled to summary judgment because Plaintiff cannot establish a genuine issue of fact regarding his prima facie case or that Defendant's reasons for his discharge were a mere pretext for retaliation.  The court agrees and will grant Defendant's motion because Plaintiff has failed to establish a material issue of fact regarding a causal connection between his 2004 FMLA leave associated with his knee injury and Defendant's determination to end his at will employment.

### A.  Prima Facie Case

There is no dispute that Plaintiff satisfies the first two elements required to establish a prima facie case of FMLA retaliation.  Defendant does not challenge whether Plaintiff's injury constituted a "serious health condition" covered by the FMLA and acknowledges that it approved FMLA leave for Plaintiff.  There is no debate that requesting and taking FMLA covered leave from January 13, 2004 through March 4, 2004 is protected activity.  There is also no dispute that Plaintiff's discharge constitutes an adverse employment action.[2]

Plaintiff has failed to proffer evidence that would permit a reasonable jury to conclude that Defendant's decision to discharge him was causally linked to his protected activity.  "The 'causal link' between the protected activity and adverse employment action is demonstrated by showing that the employer would not have taken the adverse action 'but for' the employee's protected activity."  *Agee*, 151 F. Supp. 2d at

---

[2] "To constitute an adverse employment action, an act must result in a loss of pay or benefits, a detrimental change in responsibilities, a negative change in the terms or conditions of employment, or some actual and unfavorable change in job status." *Birone v. Indian River Sch.*, 145 F.3d 1329, 1998 WL 199791, at *4 (6th Cir. 1998) (citing *Kocsis v. Multi-Care Mgmt.,* 97 F.3d 876, 885 (6th Cir. 1996)).

896; *see also Allen v. Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999) ("In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action."); *King*, 166 F.3d at 892 ("To demonstrate the 'causal link,' the employee must demonstrate that the employer would not have taken the adverse employment action but for the employee's protected activity.").

No one factor is dispositive in the causal connection analysis and evidence that the defendant treated plaintiff differently from a similarly situated employee or that the adverse action was taken shortly after the plaintiff engaged in the protected activity is relevant.  *Id.*  More importantly, temporal proximity alone is rarely enough to satisfy the causal element.  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563-66 (6th Cir. 2000); *Cooper v. City of North Olmsted*, 795 F2d 1265 (6th Cir. 1986).

In order to establish a causal link, Plaintiff must establish that his employer had knowledge of his protected activity when it made the decision to discharge him; without knowledge of the protected activity, there can be no inference that the adverse action was taken because of the protected activity.  *See Wade*, 259 F.3d at 463 (prima facie case of retaliation requires showing that employer was aware of protected activity); *Strouss v. Mich. Dep't of Corrections*, 75 F. Supp. 2d 711, 727 (E.D. Mich. 1999) ("Since the decision to transfer Plaintiff [the adverse employment action] actually pre-dates Plaintiff's complaints to her supervisor about Dr. Givens [the protected activity], clearly no causal nexus exists between those complaints and her transfer . . . ."); *see also Gregory v. Texas Youth Commission*, 111 Fed.Appx 719, 721, No. 04-50098, 2004 WL 2244241, at *2 (5th Cir. Sept. 28, 2004) (no causal link established when employer

16

"designated as interviewers two panelists who testified under oath that they were not aware of [the plaintiff's] previous protected activity *when they made the promotion decision* [and the plaintiff] did not present evidence to the contrary.") (emphasis added).

Defendant, as the moving party, has satisfied its initial burden under Rule 56 by identifying record evidence showing that it made the decision to discharge Plaintiff before Plaintiff requested FMLA leave on January 14, 2004.  According to the sworn testimony of Dunlap, Moses, and Polisano, the determination to discharge Plaintiff was based on his performance in 2003, including his failure to report and account for his time off, and was made on or about January 9 or 10, 2004.  As such, the decision to discharge was already made and could not have been predicated on Plaintiff's January 14, 2004 knee injury and accompanying request for qualifying FMLA leave.

It is undisputed that Dunlap had the authority and made the final determination to release Plaintiff.  (Dunlap Dep. at 5.)  Dunlap also testified that he made the decision based on information he had asked Mr. Moses to gather in November or December 2003.  (Dunlap Dep. at 5-6; Williamson Dep. at 21-22.)  Dunlap testified that he typed the discharge memorandum dated January 14, 2004 sometime during the first week of January and that a meeting was set to inform Plaintiff of his discharge on that same date.  (*Id.* at 7, 10.)  Dunlap also stated that he did not fire Plaintiff on January 14, 2004, because Plaintiff failed to show up for the meeting.  (*Id.* at 7.)

That Dunlap made the decision prior to learning of Plaintiff's January 14, 2004 request for FMLA leave is corroborated by Moses's and Polisano's deposition testimony.  Moses testified that he first learned that Plaintiff would be discharged sometime around January 9 or 10, 2004.  (Moses Dep. at 12.)  Likewise, Ms. Polisano,

17

from Defendant's human resources department, stated that she was notified that Plaintiff was going to be discharged on January 12, 2004.

Because Defendant has met its initial burden under Rule 56, Plaintiff must present evidence sufficient for a reasonable jury to infer that these three individuals were lying and that the decision to fire him was made after he requested FMLA leave on January 14, 2004. Without such evidence, Plaintiff cannot establish a triable issue on causation. *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743-44 (11th Cir. 1996) (examining similar issue in First Amendment employment retaliation context, and concluding that the plaintiff failed to present evidence sufficient to establish an issue of fact on the "casual link" element).

As an initial matter, the court notes that Plaintiff has failed to present or identify evidence establishing a causal link between his 1996 or 1999 approved FMLA leaves. His arguments focus on his 2004 FMLA leave.

In support of his argument that an issue of fact exists to link his 2004 FMLA leave with his termination, Plaintiff offers several arguments and points to several pieces of circumstantial evidence. First, he cites the temporal proximity between his actual discharge and the end of his FMLA leave and argues that Mr. Dunlap's January 14, 2004 typed letter/memorandum refers to Plaintiff's "attendance" as one reason for his termination. Second, he identifies the undisputed fact that Defendant did not execute its decision to fire Plaintiff until after he returned from an approved FMLA leave. He asks the question: "If ACO had determined that Mr. Smith was terminated on January 14, 2004, why did they allow him to take FMLA leave and pay him his regular salary for that time off?" (Pl.'s Resp. at 7.) Third, Plaintiff cites his testimony that Moses informed him

18

that he would be returning to the Livonia store after his FMLA leave ended and that Moses expressed concern for his medical condition during a status check.  (Pl.'s Dep. at 179; Moses Dep. at 14-15.)  Fourth, he identifies Defendant's failure to warn him about his alleged 2003 performance deficiencies and Defendant's failure to employ progressive discipline under ACO's attendance policy.  Fifth, he alleges that his 2003 performance review was "obviously" doctored and that Dunlap's January 14, 2004 letter purportedly authored in the first week on January 2004 is "suspicious" and suggests mendacity on behalf of Defendant and its agents.  Sixth, he argues that no other managers were discharged for engaging in the same conduct that Plaintiff engaged in during 2003.  Finally, he offers various arguments supporting his claim that Defendant's asserted reasons are a mere pretext for retaliation in violation of the FMLA.

Temporal proximity, standing alone, is not sufficient to establish a causal link and examining the reference by Dunlap to "attendance" does not create an inference that the reference was to Plaintiff's *protected FMLA leave*.  The specific comments regarding Plaintiff's attendance refer to events in 2003 and simply do not implicate Plaintiff's 2004 absence associated with his FMLA leave.  The memo provides in relevant part:

> *During the year 2003* it has been noted that Rick Smith has not been operating store #004 with the type of dedication required of an Aco Store Manager.  The most glaring area is time off taken and the accountability for that time off.  At least 8 utilization sheets were never turned in.  This is a requirement of all salaried personnel.  In conjunction with these missing utilization sheets Rick took varied amounts of time off that were never recorded as vacation or personal time and was paid his regular salary.  This amounts to approximately 16 ½ days.  In reviewing schedules throughout the year it was also noted Rick worked several 2 and 4 hour days.  Aco's managers are on a minimum 5 day work week.  Rick seldom worked a full 5 day work week.

(Def.'s Mot. Br., Ex. 8 (emphasis added).)

19

Dunlap's memorandum references issues occurring "during the year 2003" and it is undisputed that Plaintiff did not take any FMLA leave during 2003. Any attendance issues referenced in this document are not FMLA related. In addition, the reference to attendance problems concerns "time taken off and the *accountability* for that time off." (*Id.* (emphasis added).) The thrust of the attendance issues in 2003 cited by Defendant relates to Plaintiff's failure to properly account for time off, i.e. comparing his schedules from the store to his utilization sheets showed that he did not record certain time properly. Defendant also notes his failure to turn in utilization sheets for eight weeks. This memorandum does not permit a reasonable jury to infer that Dunlap was referring to the protected activity at issue in this case.

Next, Plaintiff references the fact that Defendant delayed the execution of its decision to discharge Plaintiff after he reported his injury and sought FMLA leave. Plaintiff identifies no evidence to controvert Defendant's assertion and evidentiary support showing that a meeting between Plaintiff, Moses, and Dunlap was scheduled for January 14, 2004.[3] Nor does Plaintiff deny that he informed Moses that he injured his knee prior to that meeting and that he would not be attending. It is also undisputed that Defendant never conveyed to Plaintiff its decision until after he returned from FMLA leave. Notwithstanding its determination that Plaintiff would be discharged, Defendant

---

[3] During oral argument Defendant's counsel acknowledged that there was no evidence to support Defendant's suspicion that Plaintiff had advanced warning that he would be fired on January 14, 2004. No evidence creates an inference that Plaintiff knew that his firing was imminent when he requested FMLA leave. Likewise, Plaintiff's counsel acknowledged that Plaintiff had no knowledge concerning when the decision to fire him was made. The court also notes that no evidence has been identified to controvert Defendant's evidence showing that it planned to call Plaintiff from his store in Livonia, Michigan into corporate headquarters in Farmington Hills, Michigan to inform him of his discharge on January 14, 2004.

20

approved Plaintiff's FMLA leave and paid him during his absence.  Defendant informed
Plaintiff of his discharge on the day of his return from FMLA leave, March 4, 2004.

Plaintiff argues that Defendant's decision to delay execution of Plaintiff's
discharge permits the reasonable inference that Defendant did not make its decision
until after Plaintiff requested FMLA leave.  This fact alone, however, does not
undermine the veracity of Defendant's position.  Without evidence casting doubt on
Defendant's testimony showing that the decision had been made before January 14 and
that it was going to notify Plaintiff of its determination on January 14, 2004, the fact of a
delay based on Defendant's intervening request for FMLA leave does not show a causal
link.

Under the facts presented in this case, the employer was in a proverbial "catch
22."  Once Plaintiff informed it that he was injured and once he requested FMLA leave,
the Defendant's determination could not be executed without falling close in time to
Plaintiff's FMLA leave request.  No matter when the decision to release Plaintiff was
executed, it almost certainly would be called into doubt by Plaintiff.  Defendant's choices
included discharging Plaintiff as planned on the same day he requested FMLA leave or
delaying the execution of his firing for at least some period of time.  In either event, firing
Defendant was certain to take place after he had requested FMLA.  As such, the
employer's decision in this context does not permit an inference that its three
employees are lying about the timing of Plaintiff's discharge.  In fact, when comparing
these two options, the inference suggested by Defendant's choice to grant Plaintiff paid
FMLA leave, to delay the execution of its discharge determination, and to fire him only
later upon his return to work is that his discharge was not taken in retaliation for his

21

rights.  The choice made by Defendant permitted Plaintiff to exercise his statutory rights, while continuing to be paid under ACO's leave policy.

Next, Plaintiff argues that his supervisor Moses informed him that he would be returning to the Livonia store after his FMLA leave ended and that Moses asked him about his medical condition during leave.  (Pl.'s Dep. at 179; Moses Dep. at 14-15.)  Given the undisputed facts and the context of this case, no reasonable jury could conclude that Moses, Dunlap, and Polisano were fabricating their testimony based on the fact that Moses informed Plaintiff that he would be returning to the Livonia store and that he inquired about Plaintiff's health.  It is undisputed that Dunlap, not Moses, made the determination to discharge Plaintiff and that they had planned to inform Plaintiff during an in person meeting on January 14, 2004.  Under these circumstances, Moses's statements during Plaintiff's approved FMLA leave suggest nothing more than a desire to avoid an awkward situation.  *See Mize*, 93 F.3d at 744.  Although other inferences are possible, these comments do not rise beyond a scintilla of evidence.  The decision to announce the discharge was delayed until Plaintiff returned from FMLA leave and there is no evidence that Moses had authority or was directed to inform Plaintiff of this decision until he returned from leave.

Plaintiff also identifies Defendant's failure to trigger progressive discipline under its attendance policy and his supervisor's failure to counsel or reprimand him for the alleged defects in Plaintiff's 2003 performance.  He further claims that the May 2003 review, which includes his signature, was "obviously" doctored.

Here, Plaintiff cites ACO's handbook policy regarding disciplinary action for excessive absences.  (Pl.'s Resp. at 3 & Ex. E.)  Plaintiff's Exhibit E, the excerpt of the

22

progressive discipline for ACO's employees, does not indicate whether this policy applies to both hourly employees and managers.  On the other hand, Defendant directs the court to Ms. Polisano's sworn testimony that explains that the policy cited by Plaintiff does not apply to salaried employees such as Plaintiff.  (Polisano Dep. at 6-8.) Defendant's employee handbook also unambiguously provides that "[f]alsification of utilization reports will result in immediate termination."  (Def.'s Mot. Br., Ex. 1 at 38.) Defendant's failure to follow the progressive discipline policy, therefore, does not create a reasonable inference that the decision to discharge Plaintiff was made after he applied for FMLA and in retaliation for such leave.  There is no obligation for Defendant to apply this policy to non-hourly employees.  There is also no evidence of a requirement for Defendant to progressively discipline Plaintiff (*e.g.* by providing warnings or reprimands for missing meetings, setting store alarms late or early, or missing time while failing to turn in utilization sheets).   It is uncontested that the parties' employment relationship was at will and contains no such progressive discipline requirement more often associated with "for cause" employment created by contract or usually found in collective bargaining agreements.

Next, Plaintiff argues that the May 2003 performance review discussed in the background section above was obviously doctored.  Such a conclusion is not so obvious to the court, especially when considering that his signature appears on the document. (Def.'s Mot. Br., Ex. 7.)  Williamson testified that he discussed all of the points made in the evaluation and that it was his common practice to attach a separate sheet of typed comments.  (Williamson Dep. at 26-27.)

In his response, Plaintiff fails to identify the specific testimony of Plaintiff

23

supporting this "doctoring" charge.  *See United States v. Dunkel,* 927 F.2d 955, 956 (7th

Cir.1991) (reasoning that "judges are not like pigs, hunting for truffles buried in"

deposition transcripts); *Thomas v. Halter,* 31 F. Supp. 2d 942, 945 (E.D. Mich. 2001) (a

party "should not anticipate that the Court will do what he could and should have done

for himself").  Not only does his response fail to cite the specific location of his testimony

in the text of the brief, but the attached portions of his own deposition also fail to contain

reference to the "doctored" nature of the 2003 review.  (*See* Pl.'s Resp. Br. at 2 & Ex. B

(including only pages 1, 84-85, 113-17, 136-39, 179, and 181-85).)  While Plaintiff's

counsel generally mentioned Plaintiff's testimony on this issue during oral argument, he

failed to identify specific references in the record presented to the court.[4]

Plaintiff also argues that Dunlap's January 14, 2004 memorandum is "extremely

suspicious" and suggests that it was not written during the first week of January as

Dunlap testified.  (*See* Pl.'s Resp. Ex. G.)  The court is not persuaded by this argument.

Plaintiff notes correctly that the document is not on letterhead but incorrectly states that

it is not dated.  The memorandum is not dated in the traditional sense, but contains

express reference to January 14, 2004.  Plaintiff argues that it could have been written

by anybody and at anytime.  The fact that the letter was not presented to Plaintiff until

after he requested and took FMLA leave in 2004 simply does not undermine Dunlap's

sworn testimony as to when this document was created.  Plaintiff's "suspicion" about

---

[4] In reviewing the entire record, the court located one portion of Plaintiff's
testimony in Defendant's exhibits where he testified that one of the handwritten
comments on his 2003 review was not on the review when he signed it. (Pl.'s Dep. at
157-58.)  The complete context of this line of questioning has not been presented and
the evidence does not create an issue of fact as to *when* Defendant made the decision
to discharge him.

24

this document is not supported by admissible evidence that would permit a reasonable jury to conclude that it was created only after Plaintiff took FMLA leave.  There is no *evidence* tending to show that the document *in fact was written by somebody else at a time other than as expressed* by the sworn testimony of three individuals in the record. Plaintiff's suspicions and speculation are not supported by admissible evidence.

Lastly, the court notes that Plaintiff's arguments regarding pretext are not relevant unless he establishes a prima facie case, including a causal link between his FMLA leave and the adverse employment action.  Without evidence to create an issue of fact on the timing of Defendant's termination, whether Defendant *mistakenly* believed that Plaintiff was performing poorly and was dishonest in reporting his time off is not relevant.  In other words, without evidence that the employer made its decision to fire Plaintiff *after* it learned of his 2004 FMLA leave request or evidence that his FMLA *later became* a reason for the adverse employment action, there cannot be retaliation in violation of the FMLA.

The court is necessarily concerned with whether the evidence creates an issue of fact as to whether Defendant acted with statutorily prohibited discriminatory animus, not on the accuracy of any non-prohibited reasons given by the employer–even if the court finds the reasons unwise or imprudent.  Simply put, the "soundness" of an employer's business judgment in making employment decisions is not a factor for the court to consider.  *Hutchinson v. AAR Advanced Structures*, 234 F.3d 1268, No. 99-1520, 2000 WL 1648121, at *4 (6th Cir. Oct. 26, 2000) (quoting *Town v. Michigan Bell Tel. Co.*, 568 N.W.2d 64, 72 (Mich. 1998))  ("[T]he plaintiff cannot simply show that the employer's

decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

### B.  Pretext

Even if Plaintiff could establish a causal link and a prima facie case, summary judgment is still warranted because Defendant has proffered legitimate nondiscriminatory reasons for Plaintiff's discharge and Plaintiff has not established evidence upon which a reasonable jury could conclude that those reasons were a mere pretext for discrimination.

Defendant has produced legitimate nondiscriminatory reasons for Plaintiff's discharge.  Its decision was based on Plaintiff's 2003 performance, including a lack of accountability in reporting his time as a salaried employee, failing to account for his time properly triggering concerns for his honesty, failing to work full workweeks, failing to timely open and or close ACO's hardware stores and to properly handle its assets, and missing several Regional Manager Meetings.  (*See* Def.'s Mot. Br., Ex. 8.)  In order to defeat a motion for summary judgment once Defendant articulates its legitimate nondiscriminatory reasons, it is incumbent on Plaintiff to show that the proffered reasons were pretextual.  *See Godfredson v. Hess & Clark*, 173 F.3d 365, 373 (6th Cir. 1999).  Plaintiff must present evidence to create an issue of fact on the ultimate issue of discrimination.

The Sixth Circuit recognizes that a plaintiff may demonstrate pretext "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged

26

conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003); *see also Manzer v.
Diamond Shamrock Chems. Co.*, 29 F.3d 1078 (6th Cir. 1994). The *Manzer* court
succinctly explains each of these three methods of establishing pretext in employment
discrimination cases.

> The first type of showing is easily recognizable and consists of evidence
> that the proffered bases for the plaintiff's discharge never happened, *i.e.,*
> that they are "factually false." *Baxter Healthcare,* 13 F.3d at 1123- 24.
> The third showing is also easily recognizable and, ordinarily, consists of
> evidence that other employees, particularly employees not in the protected
> class, were not fired even though they engaged in substantially identical
> conduct to that which the employer contends motivated its discharge of
> the plaintiff. These two types of rebuttals are direct attacks on the
> credibility of the employer's proffered motivation for firing plaintiff and, if
> shown, provide an evidentiary basis for what the Supreme Court has
> termed "a suspicion of mendacity." *Hicks,* 509 U.S. at ----, 113 S.Ct. at
> 2749. As *Hicks* teaches, such a showing permits, but does not require,
> the factfinder to infer illegal discrimination from the plaintiff's prima facie
> case.
>
> The second showing, however, is of an entirely different ilk. There, the
> plaintiff admits the factual basis underlying the employer's proffered
> explanation and further admits that such conduct *could* motivate dismissal.
> The plaintiff's attack on the credibility of the proffered explanation is,
> instead, an indirect one. In such cases, the plaintiff attempts to indict the
> credibility of his employer's explanation by showing circumstances which
> tend to prove that an illegal motivation was *more* likely than that offered by
> the defendant. In other words, the plaintiff argues that the sheer weight of
> the circumstantial evidence of discrimination makes it "more likely than
> not" that the employer's explanation is a pretext, or coverup.
>
> If the bare bones elements of a plaintiff's prima facie case were sufficient
> to make this showing, however, the entire "burden shifting" analysis of
> *McDonnell Douglas* and its successors would be illusory. No case could
> ever be culled out after the prima facie stage and every case would have
> to be determined by a jury. We do not believe that this was the intent of
> Congress or the outcome envisioned by the Supreme Court in its long line
> of cases implementing employment discrimination legislation.
> Accordingly, we hold that, in order to make this type of rebuttal showing,
> the plaintiff may not rely simply upon his prima facie evidence but must,
> instead, introduce additional evidence of age discrimination.

*Manzer*, 29 F.3d at 1084.

Plaintiff first claims that he has presented evidence that other hardware store managers were not discharged for failing to turn in their utilization sheets, for opening or closing their stores early or late, or for missing regional meetings. (*See* Pl.'s Resp. at 7-13, pretext arguments numbered 1-4.) Dunlap testified that managers sometimes fail to turn in utilization sheets and that he did not recall any managers being terminated for that reason. (*See* Dunlap Dep. at 9.) Polisano also stated that she was not aware of any employee terminated for not turning in the weekly utilization time sheets. (Polisano Dep. at 14.) Williamson testified that he was not aware of any manager being terminated for not turning in utilization sheets, but that managers have been terminated for falsifying them. (Williamson Dep. at 23.) Polisano also testified that she was not aware of any employee being fired for not attending store manager meetings. (Polisano Dep. at 13.) Moses also stated that occasionally store managers miss regional meetings. (Moses Dep. at 19-20.) Plaintiff testified that he missed some of these regional meetings, but others store managers also missed some and were not fired. Dunlap's testimony also shows that he knew of times where managers did not close or open their respective stores timely, but that he was unaware of any person being fired for that "sole reason." (Dunlap Dep. at 16-17.) Plaintiff offers this evidence, arguing that similarly situated employees (i.e. other store managers) were not fired for engaging in the same activity as him.

The court does not agree that Plaintiff has presented evidence demonstrating that similarly situated employees outside the protected group "were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084. "In order for

28

two or more employees to be considered similarly-situated for the purpose of creating

an inference of disparate treatment . . . the plaintiff must prove that all of the relevant

aspects of his employment situation are 'nearly identical' to those of the [other]

employees who he alleges were treated more favorably." *Pierce v. Commonwealth Life*

*Ins., Co.*, 40 F.3d 796, 802 (6th Cir. 1994). The similarity between the compared

individuals must exist in "all relevant respects." *Ercegovich v. Goodyear Tire & Rubber*

*Co.*, 154 F.3d 344, 352 (6th Cir. 1998). In the disciplinary context, the Sixth Circuit

described the analysis of similarly situated employees as follows:

> [T]o be deemed "similarly-situated", the individuals with whom the plaintiff
> seeks to compare his/her treatment must have dealt with the same
> supervisor, have been subject to the same standards and have engaged
> in the same conduct without such differentiating or mitigating
> circumstances that would distinguish their conduct or the employer's
> treatment of them for it.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Because each case arises

under different circumstances, the factors set forth in *Mitchell* are not dispositive and the

court should make an independent determination of the factors relevant to each case.

Plaintiff's evidence establishes that no other store manager has been fired for engaging

in any *one* of the individual behaviors Defendant has asserted. This does not answer

whether a manager similarly situated to Plaintiff in all relevant respects was not

released. Plaintiff has identified no other store manager who has engaged *in all of the*

*conduct* cited by Defendant. More importantly, he fails to identify another manager who

not only failed to turn in weekly utilization sheets but also failed to accurately account for

his time, yet was not fired. Plaintiff's evidence of similarly situated individuals fails to

29

create a triable issue of fact on his claim for retaliatory discharge in violation of the FMLA.

Plaintiff next argues that he did account for the 16 ½ days of vacation. Plaintiff stated that Mr. Dunlap's conclusion that "there were 16 ½ days of vacation that weren't recorded" was inaccurate. (Pl.'s Dep. at 182.) He argues that Defendant ACO has failed to provide documentation to support its claim that he took more days off than he was entitled to take. (Pl.'s Resp. at 9-10 & 16.) He notes the absence of specific documents to show that he took his five weeks of vacation permitted plus an additional 16 ½ days.

Although the record evidence is unclear whether these 16 ½ days of vacation were in addition to his normal entitlement of vacation, this fact does not create an inference of discriminatory animus or pretext for discrimination. Defendant relies on Plaintiff's failure to properly *account* for his time off, not necessarily on the fact that he took more days than he was entitled to take. A failure to report the days off results in the accrual of more paid vacation time remaining for later use.

Finally, for the reasons detailed above in the court's causal link analysis, there is insufficient circumstantial evidence for a reasonable jury to conclude that Defendant's agents are misrepresenting their lack of knowledge of Plaintiff's protected activity when Dunlap decided to release him. Plaintiff has failed to present evidence that would permit a reasonable jury to conclude that Defendant intentionally retaliated against him for exercising his FMLA rights.

## IV.  CONCLUSION

IT IS ORDERED that Defendant's "Motion for Summary Judgment" [Dkt. # 17] is

GRANTED.


 s/Robert H. Cleland                                
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  April 22, 2005


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, April 22, 2005, by electronic and/or ordinary mail.


 s/Lisa G. Teets                                   
Case Manager and Deputy Clerk
(313) 234-5522